Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN RIVERA, | Case No: |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| PFENEX INC., EEF SCHIMMELPENNINK, JASON GRENFELL-GARDNER, MAGDA MARQUET, JOHN TAYLOR, ROBIN D. CAMPBELL, LORIANNE MASUOKA, and PHILLIP M. SCHNEIDER, | |
| Defendants. | |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff John Rivera ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

**NATURE OF THE ACTION**

1. This is an action against Pfenex Inc. ("Pfenex" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(e), 14(d)(4), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§

1

78n(e), 78n(d)(4), and 78t(a), and Rule 14d-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14d-9, in connection with the proposed acquisition (the "Proposed Transaction") of Pfenex by Pelican Acquisition Sub, Inc. ("Acquisition Sub"), a wholly owned subsidiary of Ligand Pharmaceuticals Incorporated ("Ligand").[1]

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 14(e), 14(d)(4), and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(e), 78n(d)(4), and 78t(a)) and Rule 14d-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14d-9).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company conducts business in New York.[2]

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

---

[1] On August 10, 2020, Pfenex entered into an Agreement and Plan of Merger with Ligand and Acquisition Sub. Pursuant to the terms of the Agreement and Plan of Merger, Acquisition Sub commenced a tender offer to purchase all outstanding shares of Pfenex common stock for $12.00 per share in cash, plus one contingent value right equal to $2.00 per share upon achievement of a certain milestone.

[2] For example, the Company reportedly participated in conferences in New York City. *See* Pfenex, *Events*, https://pfenex.investorroom.com/events (last visited Sep. 9, 2020).

## PARTIES

6. Plaintiff is, and has been at all relevant times hereto, an owner of Pfenex common stock.

7. Defendant Pfenex is a clinical-stage development and licensing biotechnology company which focuses on developing and improving protein therapies for unmet patient needs. The Company is incorporated in Delaware. The Company's common stock trades on the NYSE American under the ticker symbol, "PFNX."

8. Defendant Eef a/k/a Evert Schimmelpennink ("Schimmelpennink") is Chief Executive Officer ("CEO"), President, Secretary, Chief Financial Officer ("CFO"), and a director of the Company.

9. Defendant Jason Grenfell-Gardner ("Grenfell-Gardner") is Chairman of the Board of the Company.

10. Defendant Magda Marquet ("Marquet") is a director of the Company.

11. Defendant John Taylor ("Taylor") is a director of the Company.

12. Defendant Robin D. Campbell ("Campbell") is a director of the Company.

13. Defendant Lorianne Masuoka ("Masuoka") is a director of the Company.

14. Defendant Phillip M. Schneider ("Schneider") is a director of the Company.

15. Defendants Schimmelpennink, Grenfell-Gardner, Marquet, Taylor, Campbell, Masuoka, and Schneider are collectively referred to herein as the "Individual Defendants."

16. Defendants Pfenex and the Individual Defendants are collectively referred to herein as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**A. Background of the Company and the Proposed Transaction**

17.  The Company is a development and licensing biotechnology company with products focused on leveraging its proprietary protein production platform, Pfenex Expression Technology®, to develop next-generation and novel protein therapeutics to improve existing therapies and create novel therapies for biological targets linked to critical, unmet diseases.

18.  The Company uses *P. fluorescens* bacterium, which are well-suited for complex, large-scale protein production. The Company has created a pipeline across multiple assets, including FDA-approved, next-generation and novel biopharmaceutical products.

19.  The Company's lead product is Teriparatide Injection, a therapeutic equivalent candidate to Forteo® (Teriparatide Injection) exclusively licensed to Alvogen. Teriparatide Injection has been commercialized in the U.S. for, among other uses, treatment of osteoporosis in certain patients at high risk for fracture. According to the Company, marketing authorization applications are pending in other jurisdictions.

20.  Licensee Jazz Pharmaceuticals is using Pfenex Expression Technology to develop hematologic oncology products, including PF743, a recombinant Erwinia asparaginase, and PF745, a half-life extended recombinant Erwinia asparaginase.

21.  Serum Institute of India and Merck & Co., Inc. are using the Pfenex Expression Technology platform to produce CRM197, a diphtheria toxoid carrier protein for use in prophylactic and therapeutic vaccines.

22.  On August 10, 2020, Pfenex and Ligand issued a press release announcing that they had entered into a definitive agreement for Ligand to acquire all outstanding shares of Pfenex for $12.00 per share in cash and $2.00 per share as a Contingent Value Right ("CVR") in the event a

4

predefined regulatory milestone is achieved by December 31, 2021. The press release states, in pertinent part:

## Ligand to Acquire Pfenex Inc.

*Expands Ligand's industry-leading technology offerings by adding a proprietary protein expression technology platform*

*Business expected to be earnings accretive in 2021 and to contribute substantial annual royalty revenue and cash flow going forward*

August 10, 2020 05:36 PM Eastern Daylight Time

SAN DIEGO--(BUSINESS WIRE)--**Ligand Pharmaceuticals Incorporated (NASDAQ: LGND) and Pfenex Inc. (NYSE American: PFNX)** today announced the signing of a definitive agreement for Ligand to acquire all outstanding shares of Pfenex for $12.00 per share in cash or $438 million in equity value on a fully diluted basis. In addition, Ligand will pay $2.00 per share or $78 million as a Contingent Value Right (CVR) in the event a predefined regulatory milestone is achieved by December 31, 2021, for a total transaction value of up to $516 million. The closing of this transaction is subject to customary conditions and is expected to occur in the fourth quarter.

Pfenex is a development and licensing biotechnology company focused on leveraging its proprietary Pfenex Expression Technology®, which offers a robust, validated, cost-effective and scalable approach to recombinant protein production, and is especially well-suited for complex, large-scale protein production that cannot be made by more traditional systems. The technology is currently out-licensed for numerous commercial and development-stage programs, as well as used by Pfenex in developing an early stage product pipeline and nanobody discovery and development capability. The versatile platform has demonstrated consistent success in the production of enzymes, peptides, antibody derivatives and engineered non-natural proteins. Partners seek the Pfenex technology as it can contribute significant value to biopharmaceutical development programs by reducing development timelines and costs for manufacturing human therapeutics and vaccines.

Pfenex's expertise in the expression of complex proteins is highly complementary to Ligand's industry-leading antibody and drug enabling technologies, building a comprehensive discovery and early stage platform.

The acquisition of Pfenex is expected to contribute a number of strategic benefits to Ligand:

- Access to a proprietary, protein expression technology that is utilized in various commercial and development-stage biopharmaceutical programs.

- Versatile operating business that is focused on licensing and generating royalty revenue from partners.
- Profitable, cash-flow positive business that is projected to be accretive to Ligand's adjusted diluted EPS beginning in 2021.
- Numerous major collaborations with leading pharmaceutical companies for treatments and vaccines, including Merck, Jazz Pharmaceuticals, Serum Institute of India and Alvogen.
- Outlook for numerous additional licenses to be potentially secured over the next few years by Ligand leveraging the Pfenex technology.
- Validated discovery platform technology driving a deep pipeline of next generation product candidates for future internal and external development.
- State-of-the-art process development operation located in San Diego with scalable equipment and engineering capabilities designed to serve the world's largest pharmaceutical companies.

"Pfenex is an ideal strategic, business and cultural fit with Ligand. The acquisition holds potential to have a significantly positive scientific and financial impact on our business in the short and long term, similar to how our Captisol and OmniAb acquisitions have played out," said John Higgins, Chief Executive Officer of Ligand. "Pfenex will add an established, proven protein expression platform to Ligand that is highly complementary to our essential, proprietary drug discovery and formulation technologies. We are confident we will be able to quickly and efficiently grow the Pfenex business, along with our core existing technologies. It has been a very positive experience working with the Pfenex executive leadership and senior scientists while we put this deal together. We look forward to welcoming the talented Pfenex team to Ligand."

"The Ligand-Pfenex combination is an excellent strategic and cultural fit, presenting a unique opportunity to leverage the complementary strengths of robust platforms and rich pipelines, we expect it to position us even better to deliver on our joint vision to develop therapeutics that provide patients a better future," said Eef Schimmelpennink, Chief Executive Officer, Pfenex. "I want to recognize and thank the Pfenex team, and express deep gratitude to each of you for your many contributions over the years, which have enabled us to reach this milestone."

**Financial Outlook**

Ligand will provide a detailed outlook for the Pfenex business and financial contribution after the transaction has closed. At this time, Ligand expects the transaction will be modestly dilutive to 2020 adjusted diluted EPS, will provide $0.10 to $0.30 of adjusted diluted EPS accretion in 2021, and will provide significant annual adjusted diluted EPS accretion thereafter with the current forecast of $0.60 to $0.80 in 2022 and $1.25 to $1.50 in 2023.

**Transaction Terms**

Under the terms of the merger agreement, Ligand will commence a tender offer to acquire all of the outstanding shares of Pfenex common stock for $12.00 per share, or $438 million upfront in cash. This represents a 57% premium to the closing price of Pfenex's stock on August 10, 2020. Ligand will also pay holders of Pfenex common stock a price of $2.00 per share, or $78 million, as a Contingent Value Right in the event a predefined regulatory milestone is achieved by December 31, 2021. The tender offer is subject to customary conditions, including the tender of a majority of the outstanding shares of Pfenex common stock, and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. The transaction is expected to close in the fourth quarter of 2020 and be funded by Ligand with cash on hand.

William Blair & Company, L.L.C. served as Pfenex's exclusive financial advisor. Wilson Sonsini Goodrich & Rosati served as Pfenex's legal counsel. Barclays Capital Inc. served as Ligand's exclusive financial advisor. Latham & Watkins LLP served as Ligand's legal counsel.

**Adjusted Financial Measures**

The adjusted financial measures discussed above exclude changes in contingent liabilities, mark-to-market adjustment for amounts owed to licensors, non-cash stock-based compensation expense, non-cash debt-related costs, pro-rata non-cash net losses of Pfenex, non-cash Pfenex purchase price amortization and non-cash tax expense.

Ligand believes that the presentation of adjusted financial measures provides useful supplementary information to investors and reflects amounts that are more closely aligned with the cash profits for the period as the items that are excluded from adjusted net income are all non-cash items. Ligand uses these adjusted financial measures in connection with its own budgeting and financial planning. These adjusted financial measures are in addition to, and not a substitute for, or superior to, measures of financial performance prepared in conformity with GAAP.

**About Pfenex Inc.**

Pfenex is a development and licensing biotechnology company with commercial products focused on leveraging its proprietary protein production platform, Pfenex Expression Technology®, to develop next-generation and novel protein therapeutics to meaningfully improve existing therapies and create novel therapies for biological targets linked to critical, unmet diseases. Pfenex uses *P. fluorescens* bacterium, which are especially well-suited for complex, large-scale protein production that cannot be made by more traditional host systems. Using the patented Pfenex Expression Technology platform, Pfenex has created a broad pipeline that is diversified across multiple assets, including FDA-approved, next-generation and novel biopharmaceutical products.

Pfenex's lead product is Teriparatide Injection (previously referred to as PF708 and Bonsity™), a therapeutic equivalent candidate to Forteo® (Teriparatide Injection) exclusively licensed to Alvogen. Teriparatide Injection has been commercialized in the U.S. for, among other uses, the treatment of osteoporosis in certain patients at high risk for fracture, and marketing authorization applications are pending in other jurisdictions. Licensee Jazz Pharmaceuticals is utilizing the Pfenex Expression Technology to develop hematologic oncology products including PF743, a recombinant Erwinia asparaginase, and PF745, a half-life extended recombinant Erwinia asparaginase. In addition, Serum Institute of India and Merck & Co., Inc. are using the Pfenex Expression Technology platform to produce CRM197, a diphtheria toxoid carrier protein for use in prophylactic and therapeutic vaccines. With headquarters in San Diego, Pfenex has 88 employees, 24 U.S. patents, 16 active partnerships and 10 products available for partnering.

Pfenex investors and others should note that Pfenex announces material information to the public about Pfenex through a variety of means, including its website (http://www.pfenex.com/), its investor relations website (http://pfenex.investorroom.com/), press releases, SEC filings, public conference calls, corporate Twitter account (https://twitter.com/pfenex), Facebook page (https://www.facebook.com/Pfenex-Inc-105908276167776/timeline/), and LinkedIn page (https://www.linkedin.com/company/pfenex-inc) in order to achieve broad, non-exclusionary distribution of information to the public and to comply with its disclosure obligations under Regulation FD. Pfenex encourages its investors and others to monitor and review the information Pfenex makes public in these locations as such information could be deemed to be material information. Please note that this list may be updated from time to time.

*   *   *

**About Ligand Pharmaceuticals**

Ligand is a revenue-generating biopharmaceutical company focused on developing or acquiring technologies that help pharmaceutical companies discover and develop medicines. Our business model creates value for stockholders by providing a diversified portfolio of biotech and pharmaceutical product revenue streams that are supported by an efficient and low corporate cost structure. Our goal is to offer investors an opportunity to participate in the promise of the biotech industry in a profitable, diversified and lower-risk business than a typical biotech company. Our business model is based on doing what we do best: drug discovery, early-stage drug development, product reformulation and partnering. We partner with other pharmaceutical companies to leverage what they do best (late-stage development, regulatory management and commercialization) to ultimately generate our revenue. Ligand's OmniAb® technology platform is a patent-protected transgenic animal platform used in the discovery of fully human mono- and bispecific therapeutic antibodies. The Captisol platform technology is a patent-protected, chemically modified cyclodextrin with a structure designed to optimize the solubility and

8

stability of drugs. The Vernalis Design Platform (VDP) integrates protein structure determination and engineering, fragment screening and molecular modeling, with medicinal chemistry, to help enable success in novel drug discovery programs against highly-challenging targets. Ab Initio™ technology and services for the design and preparation of customized antigens enable the successful discovery of therapeutic antibodies against difficult-to-access cellular targets. Ligand has established multiple alliances, licenses and other business relationships with the world's leading pharmaceutical companies including Amgen, Merck, Pfizer, Sanofi, Janssen, Takeda, Servier, Gilead Sciences and Baxter International. For more information, please visit www.ligand.com.

23. On August 31, 2020, the Company filed a Schedule 14D-9 Solicitation/Recommendation Statement under Section 14(d)(4) of the Exchange Act (the "Solicitation Statement") with the SEC in connection with the Proposed Transaction.

### B. The Solicitation Statement Contains Materially False and Misleading Statements and Omissions

24. The Solicitation Statement, which recommends that Pfenex shareholders tender their shares to Acquisition Sub in connection with the Proposed Transaction, omits and/or misrepresents material information concerning: (i) the Company's financial projections; (ii) the financial analyses performed by the Company's financial advisor, William Blair & Company, L.L.C. ("William Blair"), in connection with its fairness opinion; and (iii) potential conflicts of interest involving William Blair.

25. The omission of the material information (referenced below) renders the following sections of the Solicitation Statement false and misleading, among others: (i) Projected Financial Information; (ii) Reasons for the Board's Recommendation; and (iii) Opinion of Pfenex's Financial Advisor.

26. The tender offer in connection with the Proposed Transaction is set to expire at midnight (New York City time) at the end of the day on September 29, 2020 (the "Expiration Date"). It is imperative that the material information that was omitted from the Solicitation Statement be disclosed to the Company's shareholders prior to the Expiration Date to enable them

9

to make an informed decision as to whether to tender their shares. Plaintiff may seek to enjoin Defendants from closing the tender offer or the Proposed Transaction unless and until the material misstatements and omissions (referenced below) are remedied. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

### 1. Material Omissions Concerning the Company's Financial Projections

27. The Solicitation Statement omits material information concerning the Company's financial projections.

28. The Solicitation Statement provides that the Company's management prepared financial projections for a period of several years following 2020, which were "refined and expanded to extend through the year 2038" (the "Financial Projections").

29. With respect to the Financial Projections, the Solicitation Statement fails to disclose: (1) Pfenex's projected free cash flows and all underlying line items; (2) all line items underlying (i) Total Revenue, (ii) Total Operating Expenses, and (iii) Operating Income; and (3) a reconciliation of all non-GAAP to GAAP metrics.

30. Further, in connection with the Proposed Transaction, the Company's stockholders are entitled to receive one non-transferable CVR enabling each stockholder to receive, subject to the achievement of a specified milestone by December 31, 2021, an amount in cash equal to $2.00 (the "Milestone Payment").

31. The Milestone Payment of $2.00 per share is a significant sum of money in relation to the total value of the Proposed Transaction. More specifically, the Milestone Payment represents approximately 16.67% in additional consideration to the Company's stockholders above and beyond the $12.00 per share in cash offered by Ligand.

32. Perhaps in recognition of the importance of the Milestone Payment to the

Company's stockholders, the Solicitation Statement provides that the Company's senior management calculated "the probability of achievement of the CVR Payment Milestone on March 31, 2021" (the "CVR Probabilities").[3] The Milestone Payment becomes payable after the CVR Payment Milestone. The CVR Probabilities were provided to William Blair on August 4, 2020 and used in its financial analyses.[4] The Solicitation Statement, however, fails to disclose the CVR Probabilities.

33. The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and probability of achievement of the CVR Payment Milestone and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to tender their shares in connection with the Proposed Transaction.

---

[3] The CVR Payment Milestone refers to the conditions upon which the Milestone Payment will become payable, more specifically, "if, on or prior to December 31, 2021, the Company receives written notice from the U.S. Food and Drug Administration (the "FDA") that the Company's teriparatide injection (also referred to as PF708 or Bonsity™, the "CVR Product") is therapeutically equivalent . . . with respect to the listed product, FORTEO® (teriparatide injection)[.]" *See* Solicitation Statement at 4.

[4] "In connection with [William Blair's] financial analyses, [it] applied the CVR Probabilities to derive a value for the [$2.00 per share CVR consideration]." *See* Solicitation Statement at A-2; *see also* Solicitation Statement at 33 ("William Blair then used the implied enterprise value based on an implied value per share in the Merger of $13.65 (which represents the Cash Portion plus a present value of $1.65 of CVR Portion assuming a CVR payment date of March 31, 2021 and based on the CVR Probabilities (the "Implied Merger Consideration") to derive implied valuation multiples for the Company for CY 2022E and CY 2023E revenue based consensus estimates and the Forecasts.").

34. When a company discloses non-GAAP financial metrics in a Solicitation Statement that were relied upon by its board of directors in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose, pursuant to SEC Regulation G, all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.[5]

35. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 2. Material Omissions Concerning the Financial Advisor's Analyses

36. In connection with the Proposed Transaction, the Solicitation Statement omits material information concerning analyses performed by William Blair.

37. With respect to William Blair's "*Selected Publicly Traded Companies Analysis*" and "*Selected Precedent Transactions Analysis*," the Solicitation Statement fails to disclose the individual multiples and metrics for the companies and transactions observed by William Blair in its analyses.

38. The Solicitation Statement fails to disclose the following concerning William

---

[5] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Sep. 9, 2020) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

Blair's "*Discounted Cash Flow Analysis*:" (1) the projected after-tax unlevered free cash flow for the Company and all underlying line items; (2) the terminal values of the Company; (3) the individual inputs and assumptions underlying the perpetuity growth rate of (80%) and discount rates ranging from 11.5% to 13.5%; (4) the value of the potential tax savings expected to result from the utilization of the Company's federal net operating losses; (5) the Company's net cash as of June 30, 2020; and (6) the Company's total diluted shares outstanding as of August 3, 2020.

39. With respect to William Blair's "*M&A Premiums Paid Analysis*," the Solicitation Statement fails to disclose each transaction and the premiums paid therein.

40. The valuation methods, underlying assumptions, and key inputs used by William Blair in rendering its purported fairness opinion must be fairly disclosed to the Company's shareholders. The description of the Company's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, the Company's shareholders are unable to fully understand William Blair's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to tender their shares in connection with the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 3. Material Omissions Concerning Potential Conflicts of Interest Involving William Blair

41. The Solicitation Statement omits material information concerning potential conflicts of interest involving William Blair.

42. The Solicitation Statement provides that William Blair had a role in the "Company's initial public offering in 2014 and various follow-on and at-the-market offerings thereafter, including those in early 2020."

13

43. The Solicitation Statement, however, fails to adequately disclose the timing and nature of all past services William Blair provided to Pfenex and its affiliates and the compensation it received or expects to receive for providing such services.

44. Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

45. The omission of the above-referenced information renders the Solicitation Statement materially incomplete and misleading. This information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(e) of the Exchange Act
### Against All Defendants

46. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

47. Section 14(e) of the Exchange Act states, in relevant part:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders[.]

48. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Solicitation Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(e) of the Exchange Act.

49. Each of the Individual Defendants, by virtue of their positions within the Company as officers and/or directors, were aware of materially false and/or misleading and/or omitted information but failed to disclose such information, in violation of Section 14(e) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Solicitation Statement with respect to the Proposed Transaction.

50. The false and misleading statements and omissions in the Solicitation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares in connection with the Proposed Transaction.

51. Defendants acted knowingly or with deliberate recklessness in filing or causing the filing of the materially false and misleading Solicitation Statement.

52. By reason of the foregoing, Defendants violated Section 14(e) of the Exchange Act.

53. Because of the false and misleading statements in the Solicitation Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### For Violations of Section 14(d)(4) of the Exchange Act and Rule 14d-9 Promulgated Thereunder
### Against All Defendants

54. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55. Defendants caused the Solicitation Statement to be issued with the intent to solicit shareholder support for the Proposed Transaction.

56. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) states, in relevant part:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

57. SEC Rule 14d-9(d), adopted to implement Section 14(d)(4) of the Exchange Act, states, in relevant part:

> Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

58. In accordance with SEC Rule 14d-9, Item 8 of Schedule 14D-9 requires that a company:

> Furnish such additional material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

59. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Solicitation Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9.

60. Each of the Individual Defendants, by virtue of their positions within the Company as officers and/or directors, were aware of materially false and/or misleading and/or omitted information but failed to disclose such information, in violation of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Solicitation Statement with respect to the Proposed Transaction.

61. Defendants acted knowingly or with deliberate recklessness in filing the materially

16

false and misleading Solicitation Statement which omitted material information.

62. The false and misleading statements and omissions in the Solicitation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares in connection with the Proposed Transaction.

## COUNT III
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

63. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Solicitation Statement.

65. Each of the Individual Defendants was provided with or had unlimited access to copies of the Solicitation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Solicitation Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

66. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power

17

to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Solicitation Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Solicitation Statement at issue contains the unanimous recommendation of the Individual Defendants to tender their shares pursuant to the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Solicitation Statement.

67. In addition, as the Solicitation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Solicitation Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

68. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

69. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e), 14(d)(4), and Rule 14d-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and the tender offer in connection with the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to the Company's shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding Plaintiff rescissory damages;

C. Declaring that Defendants violated Sections 14(e), 14(d)(4), and 20(a) of the Exchange Act, and Rule 14d-9 promulgated thereunder;

D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expenses and expert fees; and

E. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 9, 2020

Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
zhalper@halpersadeh.com

*Counsel for Plaintiff*